IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CARL ROGER KIRKPATRICK,

        Plaintiff,

vs.                         CASE NO. 1:17-cv-80-MW-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Period of Disability and Disability Insurance Benefits pursuant to Title II of the Social Security Act ("the Act") and for Supplemental Security Income pursuant to Title XVI of the Act. (ECF No. 1.) The Commissioner has answered, ECF No. 9, and both parties have filed briefs outlining their respective positions. (ECF Nos. 19, 20.) For the reasons discussed below, it is recommended that the Commissioner's decision be affirmed.

## I.  PROCEDURAL HISTORY

Plaintiff filed his Title II and Title XVI applications in January 2010, alleging a disability onset date of January 15, 2011. (R. 15, 107–08, 338–52.) His applications were denied initially and upon reconsideration. (R. 111–14.) His applications were then dismissed by an administrative law judge ("ALJ") in August 2010 after Plaintiff failed to appear for a hearing. (R. 115–19.) The Appeals Council, however, remanded the case to an ALJ in July 2012 to offer Plaintiff an opportunity to explain his failure to appear. (R. 120–24.)

The ALJ determined that Plaintiff showed good cause for his failure to appeal, and the ALJ held a hearing on the merits in May 2013. (R. 74–110.) The ALJ then issued a decision unfavorable to Plaintiff in January 2013. (R. 125–47.) But the Appeals Council remanded Plaintiff's case again in January 2015 to address post-hearing evidence the ALJ received, to have the ALJ further consider Plaintiff's residual functional capacity ("RFC"), and to obtain supplemental evidence from a vocational expert ("VE") if necessary. (R. 148–51.)

On remand, the ALJ held another hearing in July 2015, following which the ALJ issued a decision unfavorable to Plaintiff on January 11,

2015. (R. 13–71.) On January 25, 2017, the Appeals Council denied

Plaintiff's request for review. (R. 1–4.) Plaintiff then filed the instant appeal.

(ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Richardson v.

Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d

580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560. However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v.*

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

*Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is

working at a substantial gainful activity, he is not disabled. 20 C.F.R. §

404.1520(b). Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his physical or mental

ability to do basic work activities, then he does not have a severe

impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a

claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a

claimant's impairments (considering his residual functional capacity

("RFC"), age, education, and past work) prevent him from doing other work

that exists in the national economy, then he is disabled. 20 C.F.R. §

404.1520(f).

## III.  SUMMARY OF THE RECORD

Because the main issue on appeal relates to Plaintiff's credibility

regarding the alleged limiting effects of his left foot deformity and Crohn's

disease, the relevant portions of the medical record, opinion evidence,

hearing testimony, and ALJ's findings are summarized below.

## A.  Medical Evidence

Plaintiff visited North Florida Regional Medical Center on multiple occasions from 2005 to 2009 complaining of chest pain. In 2005 Plaintiff underwent a cardiac catheterization, and the impression was nonobstructive coronary artery disease with severe myocardial bridging. In 2008 he underwent another catheterization, and the impression included patent coronary arteries with slow flow and an intramyocardial bridge. He also had chest x-rays and a CT that were unremarkable. Further, his physical exams throughout this time period revealed normal findings, including normal range of motion in his extremities. The impressions were often only chest pain. (R. 580–654.)

Plaintiff continued to visit North Florida from 2010 to 2012, still complaining of chest pain and at times abdominal pain. His physical exam findings, chest imaging, and other testing continued to be normal overall but for some abdominal tenderness at times, and the clinical impressions at various visits throughout this time period included chest pain, acute dyspnea, hypertrophic cardiomyopathy, a gastrointestinal bleed, upper abdominal pain, chronic alcoholic gastritis, gastroesophageal reflux disease, hyperlipidemia, hypertension, mild distal colitis, and substance

abuse. Some of his treatment notes also included references to drug-seeking behavior. (R. 944–1192.)

Plaintiff also visited Shands Hospital multiple times from 2008 to 2015. During most visits he complained of chest pain or abdominal pain. His physical examinations were overall unremarkable, and the impressions during these visits included chest pain, angina, and abdominal pain primarily as well as a rib fracture on one occasion, acute coronary syndrome on another occasion, and a hiatus hernia on one occasion. He also had diagnoses of hypertrophic obstructive cardiomyopathy, gastroesophageal reflux disease, hyperlipidemia, and hypertension. In July 2011 Plaintiff underwent a surgical septal myectomy, and in March 2012 Plaintiff had an internal cardiac defibrillator implanted. By June, however, he was noted as stable from a cardiovascular standpoint. Additionally, he reported a history of myocardial infarctions related to drug use, and his treatment records noted that his behavior was suggestive of narcotic-seeking behavior.[2] (R. 655–773, 800–22, 929–36, 1194–2263, 2362–68.)

In addition to chest and abdominal pain, Plaintiff also complained of

---

[2] On one visit, the doctor informed Plaintiff that he would not provide him Dilaudid, and Plaintiff said he would probably just leave. (R. 933.) On another visit, he requested only Dilaudid. (R. 1522.)

left ankle and foot pain. In June 2012 Plaintiff complained for the first time of left ankle pain after tripping in a hole. Plaintiff's physical examination of his left knee, ankle, and lower leg were normal, although Plaintiff did have tenderness in his left foot and a decreased range of motion in his left ankle after a second fall in July. His diagnoses included an ankle sprain and ankle pain, and his imagining revealed only a stable left foot deformity and associated joint osteoarthritis. He also refused crutches on discharge after his first injury, and by mid-July his ambulation and range of motion were normal again. He complained again of left ankle pain in early 2013, but he did not want physical therapy, only narcotic pain medication, and there was no swelling or tenderness upon examination. Further, his x-rays showed only arthritic changes. (R. 2010–49, 2076, 2098, 2235–62.)

Plaintiff also visited UF Physicians Cardiology West from 2011 to 2013. His assessments included status post myectomy, chest pain, hypertrophic obstructive cardiomyopathy, and paroxysmal ventricular tachycardia. His physical examinations were normal overall. Additionally, in 2013 it was noted that he was stable from a cardiovascular standpoint, and Plaintiff stated to his doctors that he was trying to find a job but that no one would hire him because of his defibrillator. Further, the notes contained

suspicions of narcotic-seeking behavior as well as documentation of Plaintiff's noncompliance with his prescribed medication. (R. 881–926.)

Plaintiff visited the UF Orthopaedics and Sports Medicine Institute from 2013 to 2015 regarding his left foot and ankle. In 2013 Plaintiff underwent a left triple arthrodesis with tendo-achilles lengthening to address his left foot deformity, but in October 2014 he had his left calcaneus hardware removed. The screw removal resolved his heal pain, but he continued to have some stiffness and pain. In April 2015 he sprained his left ankle and wanted a brace for support, but he did not have any swelling and his foot alignment was stable. (R. 2287–2338.)

Lastly, Plaintiff visited University of Florida Physicians in 2015 for pain management, complaining of left foot, left knee, and lower back pain. His physical exam revealed restricted range of motion of the left foot, and he walked with a limp. His ankles, however, had 5/5 motor strength, and his knees and ankles could bear weight. Plaintiff also had multilevel cervical degenerative changes as well as mild multilevel lumbar degenerative changes. The impressions included chronic left foot and knee pain, neuropathic left ankle pain, chronic lower back pain, degenerative disc and joint disease, and an acquired leg length difference, and his

treatment plan included medication and physical therapy. (R. 2339–61.)[3]

## B. Opinion Evidence

### 1. Robert Greenberg

Plaintiff underwent a physical consultative examination with Dr. Greenberg on April 16, 2009. The impressions were (1) chronic anxiety disorder; (2) atypical chest pain with recent normal cardiac catherization, ruling against significant coronary artery disease; (3) congenital deformity of the left foot, resulting in chronic pain and difficulty standing/walking. Specifically with regard to Plaintiff's left ankle, the physical examination reviewed a total absence of range of motion of the left ankle. Although Plaintiff had difficulty walking and stooping, he did not require an assisting device for ambulation. (R. 500–01.)[4]

Dr. Greenberg also performed a physical consultative examination in March 2010. His physical exam findings revealed overall normal results other than a deformity of Plaintiff's left ankle and a lack of range of motion

---

[3] Plaintiff's medical record also included mental health records from Meridian Behavioral Health Care in 2004, 2009, 2014, and 2015. (R. 503–76, 861–71, 2264–86.) Plaintiff's issues on appeal, however, involve only his physical impairments.

[4] Plaintiff also had imagining of his foot done the same day, which revealed almost a complete loss of the arch of his left foot, associated degenerative disease, abnormal angulation of the talus with respect to the navicular, and a lack of definition of the cortical margin of the medial distal calcaeus, which was of uncertain significance. (R. 497.)

of the left ankle. Plaintiff walked with a mild, left leg limp, but he did not

require a device for ambulation. The impressions were (1) severe

osteoarthritis of the left ankle as a result of congenital deformity; (2)

anxiety, depression, and panic attacks; and (3) chest pains with both

typical and atypical features for angina pectoris. (R. 790–91.)

### 2. Lance Chodosh

Dr. Chodosh conducted a physical consultative examination of

Plaintiff in June 2010. His physical examination revealed a significant

deformity of the left ankle and foot, with inversion of the left ankle,

enlargement of the joint, and lack of arch on the left side. His joints were

generally hypermobile, but his left knee had full range of motion. He had

5/5 muscle strength in the upper extremities and right lower extremity as

well as 5/5 proximal strength in the left leg and 4/5 distal strength. The

exam findings were otherwise normal overall. (827–29.)

Dr. Chodosh's impressions included (1) chronic deformity of the left

foot and ankle which interferes somewhat with prolonged walking and

standing; and (2) left knee and chronic back pain, but examination of the

left knee was clinically normal. Dr. Chodosh opined that Plaintiff could

stand and walk occasionally, sit, bend over, squat occasionally, kneel, lift

40 pounds occasionally, carry 15 pounds, handle objects, and see, hear, and speak normally. (R. 830.)[5]

## C.  Hearing Testimony

At Plaintiff's hearing on July 15, 2015, Plaintiff testified that he sometimes lives with his stepfather and he sometimes pitches a tent about a half mile from there. He said he has medical appointments every month with his gastrointestinal doctor for his Crohn's disease and colitis. Plaintiff also said the reason he does not work is because employers think he is an insurance risk due to his pace maker and defibrillator. He also said that because he walks with a cane he is unable to perform the duties employers expect him to perform. (R. 41–47.)

According to Plaintiff, he could no longer work as a prep cook because he cannot perform the long hours standing and the amount of lifting due to his lower back pain and his foot surgery. He said that his foot started to really bother him in 2001, and by 2009 he could not walk, stand for more than 20 minutes, or sit for more than 30 minutes. He also said that after his surgery he continued to have problems walking and actually walks

---

[5] The opinions of Dr. Chodosh and Dr. Greenberg are the only opinions discussed in Plaintiff's appeal. However, Plaintiff's record also includes opinion evidence from Dr. Val Bee, Dr. William Beaty, Dr. Nicolas Bancks, and Dr. Michael Zelenka. (R. 774–86, 832—34, 836–59, 872–74.)

less. At the time of his hearing, Plaintiff testified that at most he could work for three hours with a sit/stand option. (R. 47–51, 55.)

Plaintiff said the reason he cannot work full time is because his back, knees, feet, and hands start to hurt when he is working. He said that when he does household chores, he is able to help with sweeping, vacuuming, and cooking because those chores only involve five to ten minutes of work. Plaintiff also said that he takes exercise walks, but he can only walk for about half a mile before needing to take a 30 to 45 minute break and he cannot walk that amount after a break. Plaintiff testified that he uses a cane because his foot surgeon told him that he could. Plaintiff also helps cut the grass for his stepfather, but even a small yard takes him three days because of pain and trouble breathing. (R. 51–55, 63.)

From 2009 to 2013, Plaintiff said he was capable of bending over to pick things up. Plaintiff also said he had trouble squatting because his knee locks up on him. Additionally, Plaintiff mentioned that he suffers from stress, panic attacks, and anxiety attacks, and that he continues to have trouble breathing at times when he is walking. (R. 55–58.)

With regard to Plaintiff's digestive issues, he said if he does not take his medications, they are a big problem, but if he takes his medications,

then they are only a little problem. He said his gastrointestinal issues bother him at least three times a day. He also said that his gastrointestinal issues are so bad that he would not get into work or would have to leave work early six or seven days a month. (R. 58–59.)

Plaintiff also testified about his migraine headaches. He said he was told he had migraine headaches back in 2009 or 2010, but he does not take medication for them. He said that these migraine headaches last between three and four hours, but if they last longer, he goes to the emergency room. He says he goes to the emergency room multiple times a month regarding chest pain and headaches. (R. 60–62.)

## D. The ALJ's Findings

The ALJ found that Plaintiff meets the insured status requirements of the Act through June 30, 2013, and that Plaintiff has not engaged in substantial gainful activity since his alleged onset date of January 15, 2011. The ALJ also found that he has the following severe impairments: chronic deformity of the left foot and ankle, hypertrophic cardiomyopathy status most myomectomy, degenerative disc disease, Crohn's disease, and a mood disorder. However, none of these impairments, or a combination thereof, meets or medically equals the severity of one of the

listed impairments. (R. 19.)

Based on the entire record, the ALJ concluded that Plaintiff has the RFC to perform light work, except he can only occasionally climb, balance, stoop, crouch, crawl, and kneel. He cannot work around hazards and is limited to simple routine tasks with no exposure to the public. He also requires an articulated production schedule so that he does not need to make independent goal-setting judgments. (R. 21.)

The ALJ then found that Plaintiff was not capable of performing any past relevant work. However, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Accordingly, the ALJ concluded that Plaintiff was not under a disability at any time from January 15, 2011, through the date of the decision, September 11, 2015. (R. 31–34.)

## IV.  DISCUSSION

Plaintiff phrases the issue on appeal as follows: The ALJ should have found Plaintiff disabled at Step Five because "it is entirely credible that as a direct and proximate result of his combination of impairments as of June 30, 2013 . . . he cannot be present and function in the workplace eight (8) hours a day five (5) days a week, for an entire month, without being absent

from work two or more days per month."[6] Further, even if Plaintiff could be

present, he would require too much additional "nonproductive time" to meet

the expectations of his employer. (ECF No. 19 at 30.)

With regard to the ALJ's decision, Plaintiff argues that the ALJ failed

to give adequate reasons as to why she discredited Plaintiff's subjective

testimony regarding the number of days he is nonfunctional per month as a

result of his Crohn's disease. Further, Plaintiff argues that the ALJ failed to

provide adequate reasons why she did not find Plaintiff's testimony

regarding his limited ability to stand and walk credible despite the fact that

two consulting physicians—Dr. Greenberg and Dr. Chodosh—noted severe

leg dysfunction. (R. 31–33.)

Ultimately, Plaintiff says that the "failure to accept [Plainitff's]

obviously credible testimony with regard to limitations in standing and

walking led to ALJ Barlow's improper residual functional capacity

assessment that [Plaintiff] could perform light work" and that "substantial

evidence cannot support a finding that [Plaintiff] can perform light work as

no reasonable person who was aware of his congenital left ankle deformity

---

[6] According to Plaintiff, these impairments include "chronic deformity of the left foot and ankle despite surgical repair, hypertrophic cardiomyopathy status post myomectomy, degenerative disc disease, Crohn's disease, depression, anxiety, panic attacks and a mood disorder." (ECF No. 19 at 30.) Yet Plaintiff only makes argument about his Crohn's disease and left foot and ankle deformity.

could possibly conclude that he could be on his feet for six hours a day."
(R. 31–33.)

If the ALJ decides to discredit the claimant's testimony as to his subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding. *Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir. 1995). While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was not credible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.* at 1562. The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991). The Court will not disturb a properly articulated credibility finding that is supported by substantial evidence. *Foote*, 67 F.3d at 1562.

In this case the ALJ determined, after considering the record evidence, that Plaintiff's

> medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. It is important to note that the claimant appeared very candid about his activities of

daily living and his ability to perform activities that are not
consistent with an individual wholly unable to perform work
activities on a sustained basis and certainly not consistent with
an individual who requires a cane for ambulation. The totality of
the record reflects an ability to perform within the above
residual functional capacity . . . .

(R. 28.)

In making the credibility assessment, the ALJ considered the medical

and opinion evidence, Plaintiff's daily activities, and Plaintiff's subjective

statements about the intensity, persistence, and limiting effects of his

symptoms. (R. 21–31.) Not only did the ALJ articulate explicit and

adequate reasons for discrediting Plaintiff's testimony, but substantial

evidence supports the ALJ's credibility assessment as well as the ALJ's

RFC determination.

In explaining the reasoning behind the ALJ's credibility assessment,

the ALJ first discussed Plaintiff's hearing testimony, which included some

of Plaintiff's statements about his activities of daily living. Specifically, the

ALJ found that Plaintiff "described daily activities which are not totally

limited and are consistent with residual functional capacity reached in this

decision." These activities included cooking, performing household chores,

caring for personal hygiene, riding public transportation, carrying laundry

during a seven-minute walk, doing laundry, and mowing the yard (which

sometimes takes multiple days). The ALJ also noted that these activities are inconsistent with an individual who requires a cane for ambulation on a regular basis.[7] (R. 28.) *See also Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (noting that reports of daily activities are also a proper consideration in making a credibility determination).

The ALJ next discussed Plaintiff's subjective statements regarding his congenital left foot impairment. The ALJ noted that Plaintiff said he cannot work as a cook anymore due to this impairment. He also said that his foot hurts when he stands for long periods, which requires him to sit down for a break. However, the ALJ noted that Plaintiff also testified to working as a cook up to 2009 and then as a care-giver for a friend's father through 2010. (R. 28.)

The ALJ then compared these subjective complaints regarding Plaintiff's left foot to the medical and opinion evidence in the record. The ALJ first discussed Dr. Chodosh's consultative examination of Plaintiff. Dr. Chodosh noted that Plaintiff had a significant left foot and ankle deformity, with inversion of the left ankle, enlargement of the joint, and lack of arch on

---

[7] The ALJ also noted that "[a]lthough the claimant testified he uses a cane to ambulate, the record does not establish that a hand-held assistive device is medically required pursuant to SSR 96-9p." (R. 30.)

that side. Dr. Chodosh's diagnosis included chronic deformity of the left foot and ankle, which interferes somewhat with prolonged walking and standing, as well as left knee and chronic low back pain. Upon examination, however, Dr. Chodosh found that Plaintiff's left knee was clinically normal, and he opined that Plaintiff could stand, walk, squat, and lift up to 40 pounds occasionally as well as carry 15 pounds. (R. 28.)

The ALJ also discussed Plaintiff's treatment notes regarding his left lower extremity, which begin with a left ankle injury in July 2012. The ALJ stated that Plaintiff reported tripping in a hole but that he walked through the pain to get to the emergency room. His treatment notes from this incident reveal normal range of motion and no swelling or tenderness in his left foot and ankle. Plaintiff also refused crutches and was discharged ambulatory. Based on these notes, the ALJ concluded that his "refusal of treatment indicates that his pain was not as severe as he alleged. Further, his negative left foot and ankle examination would also indicate that his impairment is not as limiting as he alleges." (R. 28.)

Moreover, the ALJ discussed medical records from Plaintiff's left ankle surgery in 2014. Specifically, the ALJ noted that treatment notes following the surgery show that Plaintiff could perform activities as

tolerated and reported a decrease in ankle pain in July 2015. Additionally, the ALJ noted that Plaintiff showed signs of treatment non-compliance by removing his post-operative splint against his surgeon's advice. (R. 28–29.)

The ALJ also discussed Plaintiff's low back pain. The ALJ stated that although the back pain is chronic, the only treatment he has received for this is medication he has requested. The ALJ also found that nothing in the medical records evidences that Plaintiff's degenerative disc disease is severe enough to preclude him from working in accordance with the ALJ's RFC assessment. (R. 29.)

With regard to Plaintiff's mood disorder, the ALJ found that it does not affect his functioning at a level that would require a finding of disabled. Additionally, the ALJ noted that Plaintiff was not currently receiving any type of treatment regarding his mood disorder. Plaintiff also said he was not taking medication for his mental health issues because he did not believe it would help. (R. 29.)

The ALJ then discussed Plaintiff's hypertrophic cardiomyopathy, concluding that it is not as disabling as he alleges. The ALJ acknowledged that Plaintiff's only complaints regarding this impairment are made when attempting to get pain medications. The ALJ noted that Plaintiff reported

feeling remarkably better after his ICD implant surgery in March 2012,

reporting that he could climb stairs without being out of breath. Further, the

ALJ noted that Plaintiff's April 2012 chest x-ray did not show any acute

cardiopulmonary process. The ALJ also found significant that Plaintiff "was

consistently assured during his visits to the emergency room for chest pain

that his symptoms were not cardiac in nature, yet he continued to present

to the hospital requesting only narcotic pain medication for his symptoms."

(R. 29.)

Due to the inconsistent and exaggerated information provided by

Plaintiff regarding his cardiomyopathy, the ALJ concluded that such

statements evidence that the information may not be entirely reliable. For

example, the ALJ pointed out that Plaintiff could walk one-half mile to an

appointment with Dr. Smith with only slight chest discomfort but that he

consistently went to the emergency room for severe chest pain. Dr. Smith

and Dr. Brearley also noted that he was thought to be seeking narcotics.

(R. 29.)

The ALJ also found it worth noting that Plaintiff's treatment notes are

"replete" with indications that he had drug-seeking behavior. Plaintiff went

to the emergency room as many as seven times in one month requesting

narcotic pain medication. Additionally, following a surgery in July 2011, he finished 60 pills of Dilaudid in approximately four to five days. (R. 29.)

The evidence showed that Plaintiff at times refused treatment when he did not receive the pain medications he requested. In March 2011 Plaintiff said he would probably leave the hospital when he was offered Tylenol and Ultram instead of narcotic medication. And in May 2012 he ripped the prescription off his discharge papers from the hospital and threw it in the trash because he said he had that medication at home. Plaintiff also left the hospital during admittance in July 2012 to get unknown pain medication from a friend. (R. 30.)

The ALJ highlighted other conduct, which the ALJ concluded, makes Plaintiff appear less limited by his impairments than he suggests. Plaintiff admitted not taking his medication as prescribed as well as continuing to smoke, drink, and use cocaine against the advice of his doctors. Additionally, Plaintiff told Dr. Smith that he was trying to find a job but that employers would not hire him because he has a defibrillator. Dr. Smith said she did not see any reason that he should be prevented from working. (R. 30.)

The ALJ also found significant Plaintiff's testimony regarding his use

of a cane to ambulate. Despite the fact that proffered that he uses a cane, the ALJ pointed out that the medical record does not contain any evidence that the use of a hand-held assistive device was medically necessary. Furthermore, the ALJ again highlighted that Plaintiff's reported activities are inconsistent with the use of a cane. (R. 30.)

In addition to the medical evidence, the ALJ considered and relied upon the opinion evidence in the record. With regard to Dr. Chodosh's opinion, the ALJ assigned it great weight as consistent with the other credible medical evidence. The ALJ gave limited weight to the opinion of a State agency consultant because the totality of the evidence available at the hearing level supported a different finding. And the opinions from other reviewing doctors were given significant weight because they had the bulk of Plaintiff's treatment notes, their findings were consistent with Plaintiff's testimony regarding his daily activities, and the evidence in total supported their conclusions. (R. 31.)

As required the ALJ also considered the combined effects of Plaintiff's impairments and the possibility that the combined effect could be greater than each of Plaintiff's impairments considered separately. This is evidenced by the ALJ's statement in his written decision that "[t]he claimant

does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments." (R. 19.)

After considering all the medical and opinion evidence as well as

Plaintiff's testimony, the ALJ assessed Plaintiff's credibility as follows:

> while the claimant has medically determinable impairments that
> could reasonably cause some symptoms and limitations, the
> above evidence shows that the claimant's testimony regarding
> the extent of such symptoms and limitations is not fully
> credible. However, the claimant's complaints have not been
> completely dismissed, but rather, have been included in the
> residual functional capacity to the extent that they are
> consistent with the evidence as a whole. Nevertheless, in
> considering the criteria enumerated in the Regulations and
> Rulings for evaluating the claimant's subjective complaints, the
> claimant's testimony was not persuasive to establish an inability
> to perform the range of work assessed herein. The location,
> duration, frequency, and intensity of the claimant's alleged
> symptoms, as well as precipitating and aggravating factors are
> adequately addressed and accommodated in the above
> residual functional capacity.

(R. 31.)

As is evident in the ALJ's opinion, the ALJ properly considered

Plaintiff's testimony and daily activities, the objective medical evidence,

and the opinion evidence in the record, eventually finding that while

Plaintiff's impairments could produce some of his alleged symptoms, his

testimony was not entirely credible. Based on the record as a whole, the

ALJ found that Plaintiff can perform light work with certain limitations as

provided in the RFC determination. As discussed above, these findings are properly articulated and supported by substantial evidence.

Plaintiff argues that due to a combination of his impairments,[8] he cannot function in the workplace full-time without being absent from work two or more days a month or requiring too much additional break time to meet the productivity expectations of an employer. As support for this argument, however, Plaintiff relies only upon his testimony and opinion evidence related to Plaintiff's severe leg deformity.[9] Plaintiff also makes the conclusory allegation that the RFC determination is not supported by substantial evidence. (ECF No. 19 at 30.)

This argument suffers from multiple problems. For starters, a mere diagnosis—whether of Crohn's disease, a leg deformity, or anything else—is not dispositive of disability. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) ("[T]he mere existence of these impairments does not reveal the extent to which they limit her ability to

_____

[8] Plaintiff lists his impairments as chronic deformity of the left foot and ankle despite surgical repair, hypertrophic cardiomyopathy status post myomectomy, degenerative disc disease, Crohn's disease, depression, anxiety, panic attacks, and a mood disorder.

[9] Plaintiff does not include support from the record regarding any of the alleged impairments listed other than his Crohn's disease and leg deformity. He also does not include support from the medical evidence, only opinion evidence and his subjective testimony.

work or undermine the ALJ's determination in that regard."); *see also McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work . . . .") Disability is about functional limitations on a claimant's ability to engage in work activities and not simply whether a claimant can point to a diagnosis.

The next problem with this argument is that Plaintiff has failed to show that his testimony regarding the severe limitations resulting from his left foot impairment is credible. According to Plaintiff, the ALJ "failed to give adequate reasons why she did not find [Plaintiff's] testimony, with regard to his limited ability to stand and walk, credible even though both of the consulting physicians . . . noted severe left leg dysfunction." (ECF No. 19 at 31.)

Despite Plaintiff's argument to the contrary, the ALJ was not required to find Plaintiff's testimony regarding his ability to stand and walk credible simply because two consulting physicians noted severe left leg dysfunction. Plaintiff's testimony was that he could not stand or walk. More specifically, he testified that he could only stand for 20 minutes before needing a break and that he could only walk for about half a mile before

needing a 30 to 45 minute break, stating that he could not walk more than

that after a break. (R. 47–55.) Yet the only evidence Plaintiff cites in

support of such extreme limitations in standing and walking is the opinion

evidence from Dr. Greenberg and Dr. Chodosh. (ECF No. 19 at 31–32,

35.)

     While it is true that Dr. Greenberg noted a marked deformity of

Plaintiff's left foot, difficulty standing and walking, a left leg limp, an

absence of range of motion of Plaintiff's left ankle, and severe

osteoarthritis of the left ankle, he also concluded that Plaintiff did not

require any kind of assistive device for ambulation. (R. 500–01, 790–91.)

Nothing in his opinions about Plaintiff support the extreme limitations

included in Plaintiff's testimony.

     The same is true regarding Dr. Chodosh's opinion. Dr. Chodosh

noted a significant deformity of the left ankle and foot, with inversion of the

left ankle, enlargement of the joint, and lack of arch on the left side. But he

also noted that Plaintiff had full range of motion in his left knee, 5/5 muscle

strength in the upper extremities and right lower extremity as well as 5/5

proximal strength in the left leg and 4/5 distal strength. Yet even with these

limitations, Dr. Chodosh opined that Plaintiff could stand and walk

occasionally, and he stated that Plaintiff's deformity would only interfere somewhat with prolonged walking and standing. (R. 827–30.) Again, this opinion hardly supports Plaintiff's extreme subjective limitations.

Then, without citation to the record, Plaintiff argues that his "congenital left ankle problem had, by June 2010, resulted in such significant lack of use of his leg that the left leg had atrophied. Thus, his testimony with regard to limited ability to stand and walk should have been taken as true." (ECF No. 19 at 35.) But again, the fact that Plaintiff's left leg had atrophied does not show what functional impairments Plaintiff had as a result of his left leg impairment, particularly without reference to any other evidence in the record showing limitations from the condition.

Additionally, Plaintiff's conclusory statement that "substantial evidence cannot support a finding that [Plaintiff] can perform light work as no reasonable person who was aware of his congenital left ankle deformity could possibly conclude that he could be on his feet for six hours a day" is easily refuted by the record evidence as a whole. The ALJ specifically addressed Plaintiff's work history, his daily activities, Dr. Chodosh's opinion, treatment notes showing overall normal physical examination findings and test results, Plaintiff's refusal of certain treatment, and records

of improvements following Plaintiff's surgery—all of which "indicate that his impairment is not as limiting as he alleges." (R. 28–29.) In other words, substantial evidence does support a finding that Plaintiff could perform light work with the limitations provided in the ALJ's RFC determination.

The last problem with Plaintiff's argument is that Plaintiff has failed to show that his testimony regarding the severe limitations resulting from his Crohn's disease is credible. At the hearing Plaintiff testified that he would miss up to seven days a month as a result of his Crohn's disease. And in his brief, rather than citing to the record, Plaintiff argues the following:

> Additionally, plaintiff Kirkpatrick has Crohn's disease; a chronic inflammatory bowel disease that affects the lining of the digestive tract. Crohn's disease can cause abdominal pain, diarrhea, weight loss, anemia, and fatigue. Crohn's disease cannot be cured and persons with Crohn's disease have severe chronic symptoms that never go away. Crohn's disease is a serious enough impairment that the Social Security Administration includes Crohn's disease as a qualifying condition under listing 5.06, Inflammatory Bowel Disease. Thus, plaintiff Kirkpatrick's testimony with regard to how the chronicity of his Crohn's symptoms would cause him to miss work up to six times a month should also ahve been taken as true by ALJ Barlow.

(ECF No. 19 at 35.)

The ALJ's opinion, however, specifically highlights contradictions in Plaintiff's testimony regarding his gastrointestinal problems: Plaintiff "said

he has digestive problems but that as long as he is on his medication his problem is little, yet he said he would miss up to seven days of work per month due to gastrointestinal problems." (R. 23.) Also, Plaintiff's medical records show generally unremarkable gastrointestinal and abdominal exam findings, although he was diagnosed with possible inflammatory bowel disease and likely Crohn's disease in 2015. However, as the ALJ noted, Plaintiff even stated that his gastrointestinal issues were well-controlled with medication.

Because Plaintiff failed to provide citation to medical evidence to support his severe alleged limitations resulting from his Crohn's disease and because the medical record as a whole fails to support such extreme limitations, the Court declines to find that the ALJ erred in either her credibility determination or the RFC determination based on Plaintiff's subjective testimony alone that he would miss up to seven days a month due to his Crohn's disease.

Despite Plaintiff's arguments to the contrary, the ALJ did not err in discrediting Plaintiff's testimony as evidenced by the record as a whole and the ALJ's opinion. *See Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) (noting that "[t]he question is not . . . whether ALJ

could have reasonably credited [the plaintiff's] testimony, but whether the ALJ was clearly wrong to discredit it"). Because the ALJ's credibility assessment is properly articulated and is supported by substantial objective medical evidence, the Court concludes that the ALJ did not err in her credibility assessment.

Lastly, without citation to the record, case law, or regulations, Plaintiff makes the following argument: "[T]he requirement that the impairments be considered in combination would clearly and convincingly show that the plaintiffs [sic] combination of cardiovascular problems and congenital deformity would preclude standing and walking six hours a day." (ECF No. 19 at 23.)

This argument has no merit. The ALJ must "make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled," *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987) (per curiam) (quoting *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984). Here, the ALJ did so.

Not only did the ALJ discuss at length Plaintiff's cardiovascular problems and congenital left foot deformity (in addition to all of Plaintiff's

other alleged impairments), the ALJ also specifically found that Plaintiff

"does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments." (R. 19.)

This finding is sufficient to show that the ALJ properly considered the

impact of the combination of Plaintiff's impairments. *See Reliford v.

Barnhart*, 157 F. App'x 194, 196 (11th Cir. 2005) (unpublished)

("Specifically, the ALJ found that [the plaintiff] has an 'impairment or a

combination of impairments' considered severe, but that her medically

determinable impairments did not equal one of the impairments listed in

the regulations. Thus, the ALJ sufficiently considered the impact of [the

plaintiff's] impairments in combination."); *see also Wilson v. Barnhart*, 284

F.3d 1219, 1224 (11th Cir. 2002) (finding that the ALJ's statement that the

plaintiff "did not have an impairment *or combination of impairments* listed

in, or medically equal to one listed in Appendix 1, Subpart P, Regulations

No. 4" evinced the ALJ's consideration of the combined effects of the

plaintiff's impairments).

        In sum, because substantial evidence supports the ALJ's properly

articulated credibility assessment and the ALJ's RFC determination and

because the ALJ satisfactorily considered Plaintiff's impairments in

combination, Plaintiff has provided no reason to reverse the

Commissioner's decision.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the

decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 19th day of April 2018.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**